**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0313n.06

**No. 09-4559**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**May 13, 2011**

LEONARD GREEN, Clerk

DAVID CARSON,                                    )
                                                 )
    Plaintiff-Appellant,                        )
                                                 )
v.                                               )  ON APPEAL FROM THE UNITED
                                                 )  STATES DISTRICT COURT FOR THE
PATTERSON COMPANIES, INC., dba                   )  SOUTHERN DISTRICT OF OHIO
Patterson Dental Supplies; PATTERSON             )
DENTAL SUPPLIES, INC.,                           )
                                                 )
    Defendants-Appellees.                       )

Before: BATCHELDER, Chief Judge; MARTIN and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Patterson Dental Supply discharged David Carson after the company found evidence that Carson had submitted false expense reports. Carson, an African-American, filed this action based on disparate-treatment and wage discrimination. The district court granted summary judgment to Patterson Dental on both claims, and Carson appeals only the disparate-treatment ruling. Because Carson presents no evidence that would allow a reasonable jury to conclude that Patterson Dental's purported reason for discharging him was a pretext for race discrimination, we affirm.

I.

Patterson Dental distributes supplies to dentists and veterinarians. In March 2007, the company hired David Carson as a Branch Operations Manager, an at-will position. One of Carson's responsibilities was to purchase tools and supplies for the Columbus, Ohio branch. He paid for some purchases with an American Express corporate card, after which Patterson Dental reimbursed him. For other purchases, the suppliers billed Patterson Dental directly.

In two December 2007 purchases, Carson ordered several tools from Grainger Tool for $754.77. He knew that Grainger was supposed to bill Patterson Dental directly for the orders, but he apparently had trouble with the Grainger website. Under the "delivery info" section of the form, Grainger's website requested a "P.O. or AMEX™ Ref. #." R.17-13 at 4. When Carson tried to submit his order, the Grainger website, in his words, "would not let [him] complete the order without putting in [his] AMEX information." R.17 at 198. He entered his American Express number into a field, and the order went through.

Carson submitted expense reports for the Grainger purchases. At the end of the month, he paid his American Express bill but discovered an anomaly: He still had money in the bank account that he used to pay his American Express bill. The only money he put in that account was reimbursements from Patterson Dental, and he used the funds in that account only to pay off his American Express card, typically leaving a zero balance after he paid his American Express bill.

The extra funds were there because Grainger had not charged his American Express card for the December 2007 tool purchases. Although he had entered his American Express card number at some point during the Grainger order, Grainger had billed Patterson Dental directly.

After Carson noticed his unusual account balance, he told his supervisor Nick Abruzzo that he "must have not been billed for something." R.17 at 219. (Abruzzo testified that Carson did no such thing, but at this stage of the litigation we resolve all factual disputes in Carson's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).) Abruzzo allegedly "told [Carson] not to worry about it," prompting Carson not to investigate further why he had the extra funds. R.17 at 219.

In early 2008, Polly Koch, who oversaw operations for the Columbus branch, discovered that the company had improperly reimbursed Carson for some purchases. On February 12, 2008, Koch emailed another Patterson Dental employee, asking, "Why would we be expensing something that was a direct bill?" R.17-22 at 2. That employee passed the question along to Abruzzo, who sent Carson an email the same day asking him to explain what had happened. Three days later, Carson responded, "Taking care of what I can today, but we need to talk about some of the other answers they are looking for . . ." *Id.* at 1. Abruzzo suggested that they meet on Monday.

They met on Monday, and Abruzzo again asked Carson to explain why he had requested a reimbursement when he had not been charged for the purchase. Carson responded that he thought he *had* been charged for the Grainger purchase and that he needed to investigate further.

On February 25, 2008, Abruzzo discharged Carson. Abruzzo was convinced that Carson had stolen money from Patterson Dental and had violated the company's prohibitions against "theft, deception, [and] dishonesty." R.19 at 15. The conversation "was really brief." R.17 at 275. Carson asked why he was being discharged, and Abruzzo responded that Carson's handling of the Grainger expense report situation "was against company policy," R.19 at 19. Carson did not try to explain what had happened, though he did argue that he "never blatantly falsified the expense report" and that he could give the money back. R.17 at 274.

Carson sued the company in state court, alleging disparate-treatment discrimination and wage-and-hour discrimination under state law. The company removed the case on diversity grounds, counterclaimed to recover the $754.77 reimbursement payment and moved for summary judgment. The district court granted the motion as to Carson's disparate-treatment claim because he could not demonstrate that Patterson Dental's proffered reason for discharging him was a pretext for race discrimination. The court granted the motion on Carson's wage-and-hour discrimination claim because he "fail[ed] to show that defendant paid him less than other employees for equal work." R.35 at 25. Carson appeals the disparate-treatment ruling.

II.

Ohio race-discrimination law, the parties agree, generally parallels the requirements of Title VII. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Before deciding how that law applies here, we must referee a dispute

about what type of race-discrimination claim Carson has filed. Carson says that this is a "mixed-motive" race-discrimination claim, meaning that "both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). Patterson Dental says that Carson raised only a "single-motive" race-discrimination claim, meaning that nothing but "an illegitimate reason motivated an employment decision." *Id.*

Patterson Dental is correct. Carson raised only a single-motive claim before the district court. All that Carson has to rebut the point is one sentence in his complaint: "Upon returning from his meeting with Mr. Rogan, Mr. Abruzzo terminated Plaintiff for an alleged ethical violation related to the expense." R.3 ¶ 12; R.4 ¶ 12. But this statement does not describe, much less preserve, a mixed-motive claim. His briefs before the district court do no better. There, he cited only cases involving traditional disparate-treatment claims, not mixed-motive claims. To preserve an argument for appeal, a party must first "squarely present[]" it to the district court. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996). Carson did not raise a mixed-motive theory below, and he thus has forfeited it on appeal.

In the absence of direct evidence of race discrimination, which all agree does not exist here, the *McDonnell Douglas* analysis controls. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, Carson bears the burden of establishing a prima facie case of race discrimination: (1) that he was a member of a protected class; (2) that he was discharged; (3) that he was qualified for the position; and (4) that he was replaced by a person outside the protected class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). If Carson carries his burden, the onus

shifts to Patterson Dental to offer a legitimate, nondiscriminatory reason for discharging Carson. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If Patterson Dental meets its obligation, Carson must show that the company's proffered reason is a pretext for illegitimate race discrimination: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

This case comes down to pretext, as the parties have no qualms with the district court's conclusions regarding the first steps of the *McDonnell Douglas* analysis. Carson argues that Patterson Dental's proffered reason was insufficient to fire him in view of the company's treatment of other employees, namely Bev Reeder, Ryan Guark, Nick Abruzzo and Steve Wilkins, all Caucasian employees who allegedly were not discharged after engaging in substantially similar conduct. We disagree.

To be "similarly situated" to Carson, the other employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. That rules out Abruzzo. He was Carson's boss and could not "have dealt with the same supervisor" as Carson. Abruzzo also engaged in different conduct from Carson. Abruzzo entered an item on an expense report under the wrong code, which may have led to accounting errors but would not have resulted in reimbursement for an expense that Abruzzo did not incur. Abruzzo also corrected his error before the report went to be

processed for reimbursement, also distinguishing him from Carson. Nor did Ryan Guark work for Abruzzo. He was a branch operations manager in the Indianapolis office and worked for a man named Thad Miller. Carson, at any rate, does not even allege that Guark misused a corporate credit card or submitted a false expense report.

That leaves Bev Reeder and Steve Wilkins. Reeder accidentally purchased shoes with her corporate credit card, while Wilkins bought gasoline for his personal vehicle with his corporate credit card. Yet several circumstances distinguish their conduct from Carson's. Like Carson, their mistakes might have led to a violation of the company's policy if left uncorrected. But unlike Carson, Reeder and Wilkins corrected their mistakes immediately. Reeder realized what she had done as soon as she swiped her card and tried to correct the mistake before she left the shoe store. When that did not work, she promptly notified Carson and Abruzzo. Wilkins contacted Carson, his supervisor, admitted his mistake and corrected the situation right away.

Carson took a different path. Abruzzo emailed him about the Grainger expense reports on February 12, 2008. Carson waited three days to respond, and even then he did not try to provide an answer. Three days later, Carson and Abruzzo met, but still Carson had no answers. Sometime that week Carson allegedly figured out what had happened, but he planned to wait until Abruzzo returned from a business trip before he said anything. When Patterson Dental discharged him on February 25, Carson had known for thirteen days that the company wanted an explanation, yet he had not corrected the mistake or explained what had happened. More than two months had passed since the Grainger purchases, which alone distinguishes Carson from Reeder and Wilkins, who took care of

their mistakes immediately. More than that, Carson differs from them because the company asked Carson for information about his reimbursement error, yet he never offered an explanation. Reeder's and Wilkins' situations never got to that point. Because Carson has presented no evidence that Abruzzo treated a similarly situated Caucasian employee differently than he treated Carson, he cannot show that the company's proffered reason for his discharge was a pretext for race discrimination.

But wait, says Carson, he *did* tell his supervisor—in January when he told Abruzzo that he had extra money in his account and "must have not been billed for something." R.17 at 219. The problem is that, when Abruzzo told him in February that the company had found an expense problem, Carson did nothing. He did not return the money. He did not remind Abruzzo of the January conversation. He did not offer an explanation for the deficiency. While Reeder and Wilkins promptly took care of their mistakes, Carson never did.

Carson adds that there is a material dispute about who discharged him. He thinks that Polly Koch and Abruzzo's boss Tim Rogan were the decision makers, that Abruzzo was a "mere conduit for their plan to have David Carson terminated." Carson Br. at 22. Yet, on this record, that is pure speculation—indeed, worse than that, as it is contradicted by the record. Koch testified that Abruzzo did not discuss his decision with her and that she did not know what Abruzzo was going to do until after he discharged Carson. Abruzzo testified that he alone made the decision to discharge Carson. And although he talked to Rogan about the situation, they did not discuss whether Abruzzo should fire Carson, and Abruzzo rejected Rogan's offer of help in dealing with the matter. Carson concedes

he has only a "gut feeling" that Rogan was involved, R.17 at 119, but that alone will not suffice to go to a jury over the issue. *Mitchell*, 964 F.2d at 584–85. Nor does Carson offer any evidence that Abruzzo was motivated by racial animus, or indeed had any racial animus, in making the decision to discharge Carson. In the final analysis, Carson has offered no evidence that would allow a reasonable jury to find that the company discharged him on account of his race.

III.

For these reasons, we affirm.