[Cite as *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-4210.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Willie Smith, Jr., | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 12AP-1073 |
| v. | : | (Ct. of Cl. No. 2009-06257) |
| Ohio Department of Public Safety et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on September 26, 2013

*The Knoll Law Firm LLC*, and *Laren E. Knoll*, for appellant.

*Michael DeWine*, Attorney General, *Randall W. Knutti* and
*Amy S. Brown*, for appellees.

APPEAL from the Court of Claims of Ohio

KLATT, P.J.

{¶ 1} Plaintiff-appellant, Willie Smith, Jr., appeals a judgment of the Court of Claims of Ohio in favor of defendants-appellees, the state of Ohio and the Ohio Department of Public Safety. For the following reasons, we affirm.

{¶ 2} Smith, who is African American, began working as a trooper for the Ohio State Highway Patrol ("OSHP") in October 1998. In June 1999, Smith was assigned to OSHP's Warren post.[1] There, Smith met Joseph Dragovich, who was a sergeant at the time. Although Dragovich was not Smith's direct supervisor, Dragovich often criticized

---

[1] After graduating from the academy, a trooper is assigned to a post. A post typically includes a post commander, who is in charge of the post, and four sergeants, who directly supervise the troopers at the post. Each post belongs to a district. Generally, each district consists of five to six posts. District headquarters are staffed by a district commander and two staff lieutenants.

Smith's work.  Smith told Dragovich that he believed Dragovich "was a little racially biased to continually bother me all the time."  (Tr. 683.)  Dragovich responded that Smith was "stupid and immature[;] [r]acis[m] had nothing to do with anything."  (Tr. 684.)  Smith complained to the post commander about Dragovich's treatment of him.

{¶ 3}  On June 29, 2000, the Director of the Department of Public Safety terminated Smith's employment for conduct unbecoming an officer; specifically, making threatening and intimidating comments to the public and co-workers.  The Ohio State Troopers Association, Smith's union, filed a grievance asserting that the Department lacked just cause to terminate Smith.  An arbitrator agreed with the union and ordered Smith reinstated.

{¶ 4}  Smith returned to work in February 2001.  The district commander required Smith to meet with Dragovich so Dragovich could relay to Smith the policy and procedure changes that had occurred during Smith's absence.  At that meeting, Dragovich told Smith that he did not want to work with Smith and that he thought that Smith did not deserve to wear the uniform.  According to Smith, during 2001 and 2002, "[Dragovich] just kept coming at me.  Every day it was something else, some write-up." (Tr. 700.)

{¶ 5}  In February 2002, Smith sent a letter to OSHP's superintendent complaining of Dragovich's "personal and racial bias" against him.  Smith also complained to Peyton Watts, then OSHP's minority relations officer, that Dragovich was targeting him because of his race.

{¶ 6}  In June 2002, Smith filed a complaint in the United States District Court for Northern Ohio against the Department of Public Safety and OSHP.  The complaint alleged Title VII claims for racial discrimination and retaliation.  The complaint arose from a charge of discrimination that Smith had filed with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission at some point after his discharge.  Apparently, the charge alleged that Smith's discharge was a result of race discrimination and retaliation.  After receiving a right-to-sue letter, Smith filed suit despite his reinstatement.  In his complaint, Smith alleged that, since his reinstatement, he had experienced harassment based on his race and retaliation for his earlier complaints of race discrimination.  Smith later dismissed his suit.

{¶ 7} At some point in 2002, Dragovich arrived at a crash scene prior to Smith. According to Smith, when he appeared at the scene, Dragovich yelled at him, apparently due to his lateness. Once Dragovich and Smith returned to the Warren post, Dragovich ordered Smith into his office. Smith refused to go without a witness. After that incident, the district commander informed Smith that he would report to the Hiram post until further notice. Smith grieved that transfer and prevailed. In 2003, Smith transferred back to the Warren post.

{¶ 8} Upon Smith's return, the district commander and his staff lieutenant, George Williams, met with Smith and Dragovich. Because Dragovich would be working the same shift as Smith, Dragovich would be Smith's direct supervisor. Williams told Dragovich and Smith that if they engaged in any further conflict, the party in the wrong would be written up. After that, the discord subsided for a time, although Smith complained that Dragovich failed to conduct ride-alongs with him as Dragovich did with the other troopers who he supervised.

{¶ 9} In August 2004, Dragovich transferred to the Lisbon post. After the transfer, Smith had no major disciplinary issues.

{¶ 10} Dragovich and Smith did not work together again until 2006. At that point, Dragovich was post commander of the Warren post. Smith was a trooper assigned to the Warren post who generally worked the third shift. Smith reported to Sergeant Michael Harmon, who reported to Dragovich.

{¶ 11} As post commander, Dragovich maintained close oversight of Smith's job performance. He criticized paperwork and a media report that Smith completed. In one instance, Dragovich told Smith not to speak with a sergeant while that sergeant was working and Smith was off the clock.

{¶ 12} In an interoffice communication to the district commander dated June 27, 2006, Smith requested a meeting with the district staff, Dragovich, and Harmon. At the July 27, 2006 meeting, Smith alleged that Dragovich was treating him unfairly and that Dragovich was racially biased. Given these allegations, OSHP initiated an administrative investigation into Dragovich's conduct.

{¶ 13} The investigator interviewed Smith and asked him to give examples of the issues between him and Dragovich. Smith claimed that Dragovich unfairly criticized his

interaction with a motorist who he arrested for diving under the influence. Smith also complained that Dragovich directed Harmon to ask three times whether a person who had complained about Smith's conduct wanted to pursue a formal complaint. Normal practice was to contact a complainant only once. Finally, Smith alluded to a dispute between him and Dragovich about the delivery of his citation paperwork to the courts.

{¶ 14} Smith admitted that the other black troopers at the Warren post did not experience that same problems with Dragovich that Smith had encountered. Smith gave contradictory reasons for Dragovich's actions. At one point, Smith alleged that Dragovich was discriminating against him because of his race; at another point, Smith stated that the issues that Dragovich had with him were personal.

{¶ 15} The investigator next questioned Dragovich, who stated that he believed that Smith had a problem with any supervisor who held him accountable and tried to keep his operations in line with policy and procedure. According to Dragovich, Smith believed that Dragovich was picking on him any time that Dragovich addressed training issues with him. Dragovich acknowledged that he had personal issues with Smith, but Dragovich claimed that he could separate his personal feelings from his professional obligations.

{¶ 16} After also interviewing Harmon, the investigator concluded his investigation. The investigator drafted a written report in which he determined that no evidence supported Smith's allegations that he was being treated unfairly and that Dragovich was racially biased.

{¶ 17} In late September 2006, Smith received a written performance evaluation for the period of April 6 to October 5, 2006. Harmon had given Smith a draft version of the performance evaluation. When Smith compared the draft and final evaluations, he discovered that the final evaluation downgraded his performance in two areas, interpersonal skills and commitment to goals, objectives, and special programs.

{¶ 18} On October 6, 2006, Smith filed a second charge of discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission. In the charge, Smith stated that he believed Dragovich was discriminating against him based on his race and retaliating against him for filing a charge of discrimination in 2000.

Smith cited the differences between the draft and final evaluations as evidence of the alleged discrimination and retaliation.

{¶ 19} After Smith filed the charge of discrimination, Dragovich would pin himself to the wall when Smith walked passed him. During the period between the filing of the charge and early 2007, Dragovich instructed Smith to wear his gun belt when he was at the post in uniform, but off duty. Dragovich also required Smith to spend more time patrolling, which reduced the time Smith had to complete his paperwork. Additionally, Dragovich questioned Smith's actions, but did not discipline him, for temporarily misplacing a hand-held radio and arriving at a training session late. At Dragovich's order, in January 2007, Smith was counseled for failing to timely service his cruiser.

{¶ 20} In May through July 2007, three incidents occurred that led to Smith's discharge. Before imposing discipline for a violation of policy and procedures or rules and regulations, OSHP conducts an administrative investigation into the suspected violation. An administrative investigation was completed on each of the three incidents.

{¶ 21} When presented with evidence of a violation of rules and regulations or policy and procedure, Dragovich, as post commander, would explain the situation to the district commander and his staff. The district commander would then determine whether the alleged violation warranted an administrative investigation. No administrative investigation could proceed without the district commander's approval.

{¶ 22} In May 2007, Dragovich discovered that Smith had claimed three hours of compensatory time for attending a court hearing when he did not appear at the hearing location or meet with the prosecutor. According to OSHP policy, if a trooper is subpoenaed to attend a court hearing during a time that he is off duty, the trooper is entitled to a minimum of three hours of compensatory time or overtime pay. However, actual court appearance is required to qualify for the guaranteed minimum compensatory time or overtime pay. Court appearances require the trooper to appear at the hearing location and meet with the prosecutor.

{¶ 23} Smith was subpoenaed to appear at the Warren Municipal Court for a 10:15 a.m. hearing on May 11, 2007. He did not appear at the hearing location or meet with the prosecutor. Therefore, when Smith claimed three hours compensatory time for the court appearance, he violated OSHP policy.

{¶ 24} Dragovich discussed this violation of OSHP policy with the district commander and his staff. The district commander decided that an administrative investigation would only proceed if Smith had failed to attend any other court hearing. Traci Mendenhall, the prosecuting attorney for the Warren Municipal Court, believed, but could not verify, that Smith missed a hearing in another case. Based on Mendenhall's belief, Dragovich received permission to move forward with the administrative investigation.

{¶ 25} At some point, Dragovich spoke with Samuel Bluedorn, the defense attorney for the case in which Mendenhall believed that Smith had missed a hearing. Dragovich asked Bluedorn whether Smith had attended the hearings for that case. Bluedorn told Dragovich that Smith had appeared at all of the hearings.

{¶ 26} The district commander assigned Dragovich to conduct the administrative investigation. As part of his investigation, Dragovich interviewed Smith. Before the interview, Smith provided Dragovich with a written statement. According to that statement, Smith drove to the courthouse to attend the hearing. After parking outside of the courthouse, Smith sat in his car speaking on his cell phone. Smith was speaking to a medical provider about medical assistance that his father needed. From his car, Smith saw the defendant's attorney leaving the courthouse. Smith then left the parking lot. After dealing with his father's medical issues, Smith called the court to check on the status of the case. Later in the day, Smith visited the court and was told that the case was continued.

{¶ 27} When Smith arrived at the post for his 10:00 p.m. to 6:00 a.m. shift, he asked Harmon whether Harmon had entered the time for his court appearance into payroll. When Harmon answered affirmatively, Smith replied that he would "get with" Harmon later. According to OSHP records, Smith verified the compensatory time entry eleven minutes after Harmon entered it into payroll and seven minutes after Smith began his shift.

{¶ 28} Smith spoke with Harmon the next day, May 12, 2007, about his claim for compensatory time for the missed court appearance. By this time, Harmon had ascertained that Smith had not attended the hearing. When Harmon stated that he was considering cancelling the payroll entry, Smith told Harmon that similar situations had

occurred with two other troopers, and one received full compensatory time and the other received one hour. According to Smith, he and Harmon decided to inform Dragovich about the situation.

{¶ 29} Smith also spoke with Williams about the incident. Smith stated he reminded Williams about the two other troopers who had received compensatory time after missing a court hearing. Smith recounted that Williams replied that "there are different strokes for different folks."

{¶ 30} As part of his investigation, Dragovich collected a statement from Harmon about his conversation with Smith on May 12, 2007. According to Harmon, when he initially asked Smith whether he went to court, Smith stated that he did go. When Harmon told Smith that Mendenhall had said that he was not there, Smith told Harmon that he had some personal business to attend to on the first floor of the courthouse. Smith admitted to settling his personal business, then leaving without going to the courtroom or the prosecutor's office. Smith added that he knew that the case would be continued because Mendenhall had previously told him that it would be continued. Harmon asked Smith whether Smith had done anything related to the case on the date that he claimed court overtime, and Smith said that he did not. Harmon told Smith that he was going to inform Dragovich about the incident. Smith asked Harmon not to do so.

{¶ 31} Another sergeant, Keith Palmer, also spoke with Smith about his missed court appearance the day after it occurred. According to Palmer's statement, Smith said that he had gone to the courthouse, but he did not go to the courtroom or prosecutor's office. Smith told Palmer that "he got tied up with a tax issue." After handling the tax issue, Smith called the clerk to inquire about the status of the case and learned that it had been continued.

{¶ 32} During his investigation, Dragovich asked Williams about the conversation with Smith that Smith recounted in his written statement. Williams denied having a conversation with Smith in which Smith referred to two other situations similar to Smith's. Williams also denied making the "different strokes" comment.

{¶ 33} Dragovich also collected a statement from Harmon regarding a conversation that Harmon said he had with Smith about a week after the incident. In that conversation, Smith said that he had spoken with three members of senior OSHP

management, and all three had stated that he would receive minor or no discipline as a result of the May 11, 2007 incident. Dragovich asked all three individuals about their alleged comments, and all three denied making them. When Dragovich asked Smith about Harmon's statement, Smith denied speaking with two of the three individuals about the incident.

{¶ 34} In his final report, Dragovich summarized his findings. Dragovich stated:

> On May 11, 2007, Trooper Smith had a 10[:]15 [a.m.] court case at the Warren Municipal Court. Trooper Smith did not appear for this court case. Through witness statements and Trooper Smith's own statements this point is not in dispute. On May 11, 2007, Trooper Smith signaled in service and out of service for this court case. This is documented and not in dispute. On May 11, 2007 at [10:07 p.m.], Trooper Smith verified/approved the payroll entry claiming compensatory time for this case which he did not appear at. This is documented and not in dispute.
>
> Trooper Smith's explanations for his actions are in conflict with statements taken as part of this investigation. Trooper Smith was given ample opportunity to clarify his answers. Trooper Smith's assertion that he has been up front or candidly open about his attempting to be compensated for a court case he did not appear at is not consistent with his evolving explanations that have been revealed in witness statements. Trooper Smith's answers are not complete, accurate or truthful.
>
> Trooper Smith did not report to the hearing location or meet with the prosecutor. Trooper Smith attempted to be compensated. Trooper Smith's actions were revealed. Trooper Smith did not answer questions completely, accurately, and/or truthfully during his interview. Trooper Smith provided a typed statement prior to his interview that is inconsistent with witness statements.

{¶ 35} The second incident that led to an administrative investigation occurred on June 25, 2007. On that date, Smith was scheduled to appear at the Warren Municipal Court for a 1:30 p.m. hearing. The subpoena for that court appearance was received and logged in at the Warren post on June 14, 2007. Approximately a week later, Smith accepted an off-duty detail escorting a vehicle. The off-duty detail was scheduled to begin at 1:00 p.m. on June 25, 2007—a half an hour prior to the court hearing.

{¶ 36} While on route to the off-duty detail, Smith contacted the Warren post and spoke with Dragovich. Smith told Dragovich that Mendenhall had continued the court hearing three weeks prior. Smith then asked Dragovich if he had to appear at the hearing. Dragovich checked the post's "court book," in which the post kept a record of all court appearances scheduled for post employees, and determined that nothing in the book indicated that the hearing had been continued. Dragovich told Smith that he would call Mendenhall and ask whether Smith was needed in court. During that phone call, Mendenhall told Dragovich that the court hearing was not continued. Mendenhall also denied ever telling Smith that it had been continued. Dragovich informed Mendenhall that Smith would not attend court as he was obligated with an off-duty detail. Mendenhall secured a continuance of the hearing.

{¶ 37} Chad Neal, an OSHP sergeant, conducted the administrative investigation into the June 25, 2007 incident. Neal interviewed Mendenhall, who repeated her assertion that she never told Smith that the court hearing was continued. Mendenhall stated that the court set the date for the June 25, 2007 hearing less than three weeks prior to June 25, 2007. Logically, Mendenhall could not know that a hearing yet to be scheduled would be continued. Mendenhall deduced, therefore, that she could not have told Smith that the hearing was continued three weeks before the hearing date.

{¶ 38} The final incident that led to an administrative investigation occurred on July 19, 2007. On that date, a clerk with the Trumbull County Eastern District Court called the Warren post seeking paperwork for a defendant who had appeared at the court for arraignment. One of the post's sergeants looked for the paperwork in the various court bins, where the post's employees placed paperwork for delivery to the courts. When the sergeant did not find the needed paperwork there, he looked in Smith's file and located the HP 7 traffic citation form that Smith had filled out when he cited the defendant for operating his vehicle under the influence. A trooper then relayed the original form to the court so the arraignment could proceed.

{¶ 39} Later that day, two of the post's sergeants confronted Smith about the missing paperwork. Smith told one of the sergeants that he had talked with a court clerk earlier that day, and the clerk had told him that the court would arraign the defendant on the defendant's copy of the HP 7 form. Smith told the other sergeant that he had called

the court the day before, and a clerk had told him not to worry about dropping off the original HP 7 form with the court.

{¶ 40} Jeffery Kelm, the OSHP sergeant who conducted the administrative investigation, spoke with the clerks for the Trumbull County Eastern District Court. The clerks denied ever speaking with Smith about the case. The deputy clerk informed Kelm that the court does not arraign a defendant if the arresting officer does not file the proper paperwork. If the original HP 7 form had not been located, the court would have dismissed the charges.

{¶ 41} When Kelm questioned Smith, he said that he had placed the original HP 7 form in the bin for delivery to the court about a week before the date of the defendant's arraignment. Smith denied speaking with the court clerks about the case. Smith also denied telling either sergeant that a court clerk had said that the court could arraign the defendant on the defendant's copy of the HP 7 form.

{¶ 42} The reports from the three administrative investigations were consolidated for review by the professional standards unit of OSHP's office of personnel. The professional standards unit identified two rules and regulations that Smith had violated: Ohio Adm.Code 4501:2-6-02(B)(1) ("A member shall carry out all duties completely and without delay, evasion or neglect.") and Ohio Adm.Code 4501:2-6-02(E) ("A member shall not make any false statement, verbal or written, or false claims concerning his/her conduct or the conduct of others."). Based on these violations, the commander of the professional standards unit recommended that Smith's employment be terminated. The superintendent of OSHP and the director of the Department of Public Safety agreed. Smith received a pre-disciplinary hearing, but the information Smith offered at the hearing did not alter OSHP's decision. The termination of Smith's employment was effective October 16, 2007.

{¶ 43} On July 14, 2009, Smith filed a complaint against the state of Ohio and the Department of Public Safety alleging claims for racial discrimination and retaliation in violation of Title VII and R.C. 4112.02. At the bench trial, OSHP witnesses testified that the terminable offense at issue was the making of false statements and claims. Failure to attend court hearings or timely submit paperwork violates the rules and regulations, but those infractions do not, by themselves, result in discharge. Charles Linek, a staff

lieutenant assigned to the professional standards unit, testified that his office determined that: (1) with regard to the first incident, Smith was dishonest when he attempted to garner court overtime even though he had not attended the court hearing or met with the prosecutor, and when he gave Dragovich a statement during the administrative investigation that varied from his statements to other people; (2) with regard to the second incident, Smith made a false statement when he claimed that Mendenhall had told him that the court hearing was continued; and (3) with regard to the third incident, Smith was dishonest when he said that a court clerk had told him that the court could arraign a defendant on the defendant's copy of a citation, and when he denied making that statement in the administrative investigation.

{¶ 44} After trial, the Court of Claims issued a decision finding that Smith had failed to prove either unlawful discrimination or retaliation.  With regard to Smith's retaliation claim, the Court of Claims found that Smith could not establish a prima facie case or prove that defendants discharged him for retaliatory reasons.  The trial court entered judgment in defendants' favor on November 19, 2012.

{¶ 45} Smith now appeals the November 19, 2012 judgment, and he assigns the following errors:

> [1.]    THE    TRIAL    COURT    MISCONSTRUED    AND MISAPPLIED THE LAW CONCERNING THE "PROTECTED ACTIVITY" ELEMENT OF A *PRIMA FACIE* CASE OF RETALIATION.
>
> [2.]    THE    TRIAL    COURT    MISCONSTRUED    AND MISAPPLIED THE LAW CONCERNING THE "CAUSATION" ELEMENT OF A *PRIMA FACIE* CASE OF RETALIATION.
>
> [3.]    THE    TRIAL    COURT    MISCON[S]TRUED    AND MISAPPLIED THE LAW CONCERNING THE CAT'S PAW THEORY AS IT RELATES TO LT. DRAGOVICH'S ROLE IN APPELLANT'S    TERMINATION    AND    ESTABLISHING PRETEXT.
>
> [4.]    THE    COURT'S JUDGMENT ON APPELLANT'S RETALIATION CLAIM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### [5.] THE TRIAL COURT MISINTERPRETED THE LAW REGARDING THE AVAILABILITY OF ATTORNEYS' FEES FOR CLAIMS BROUGHT PURSUANT TO TITLE VII.

{¶ 46} Although Smith asserted and tried claims for both discrimination and retaliation, he only appeals the judgment on his claim for retaliation. By Smith's first and second assignments of error, he argues that the trial court erred in its analysis of two elements of his prima facie case for retaliation. We will not consider the merits of these assignments of error because, even if the alleged errors occurred, they are not a basis for reversal.

{¶ 47} It is unlawful for an employer to retaliate against an employee for opposing discriminatory workplace practices or for making a charge, testifying, assisting, or participating in a Title VII or R.C. Chapter 4112 investigation, proceeding, or hearing. 42 U.S.C. 2000e-3(a); R.C. 4112.02(I). A plaintiff may prove a retaliation claim through either direct or circumstantial evidence that unlawful retaliation motivated the employer's adverse employment decision. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir.2007); *Reid v. Plainsboro Partners, III*, 10th Dist. No. 09AP-442, 2010-Ohio-4373, ¶ 55. Direct evidence is that evidence which, if believed, requires no inferences to establish that unlawful retaliation was the reason for the employer's action. *Imwalle* at 543-44. Here, Smith did not present any direct evidence of retaliation. Smith instead advanced a circumstantial case.

{¶ 48} When a plaintiff lacks direct evidence, he or she may establish retaliation through circumstantial evidence using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Imwalle* at 544; *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, ¶ 14. Under that framework, a plaintiff bears the initial burden of establishing a prima facie case of retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). In order to do so, the plaintiff must present evidence that: (1) he or she engaged in a protected activity, (2) the employer was aware that the plaintiff had engaged in that activity, (3) the employer took an adverse employment action against the plaintiff, and (4) there is a casual connection between the protected activity and adverse action. *Imwalle* at 544; *Greer-Burger* at ¶ 13.

{¶ 49} By establishing a prima facie case, a plaintiff eliminates the most common non-retaliatory reasons for the adverse employment action. *Burdine* at 253-54. Thus, establishment of a prima facie case in effect creates a presumption that the employer has unlawfully retaliated against the plaintiff. *Id.* at 254; *Hicks* at 506. That presumption places on the employer the burden of producing some legitimate, nondiscriminatory reason for its action. *Id.* at 506-07; *Burdine* at 254. Shifting the burden of production to the employer to explain its action "serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255-56.

{¶ 50} Once a plaintiff has made out a prima facie case and the employer has articulated a legitimate, nondiscriminatory reason for its action, the *McDonnell Douglas* framework is no longer relevant. *Hicks* at 510. The presumption of retaliation created through demonstration of the prima facie case, having fulfilled its role of forcing the employer to come forward with a legitimate, nondiscriminatory reason, "simply drops out of the picture." *Id.* at 511. At that point, the plaintiff's burden to prove pretext merges with the plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully retaliated. *Burdine* at 256. The plaintiff must establish "*both* that the [legitimate, nondiscriminatory] reason was false, *and* that [unlawful retaliation] was the real reason [for the adverse employment action]." (Emphasis sic.) *Hicks* at 515.

{¶ 51} The *McDonnell Douglas* framework "is intended progressively to sharpen the inquiry into the elusive factual question of [unlawful retaliation]." *Burdine* at 255, fn. 8. Once a plaintiff proves a prima facie case and the employer produces a legitimate, nondiscriminatory reason, the inquiry turns to the "specific proofs and rebuttals of [retaliatory] motivation the parties have introduced." *Hicks* at 516. At that point, therefore, the trier of fact is in the position to decide the ultimate factual issue, i.e., whether the employer unlawfully retaliated. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Thus, after a full trial on the merits, an appellate court may proceed directly to review whether the plaintiff carried its ultimate burden of

proving retaliation.[2]  *Ullman v. State*, 10th Dist. No. 03AP-184, 2004-Ohio-1622, ¶ 16. An appellate court need not first consider whether the plaintiff established its prima facie case.  *Id.*  After all, a plaintiff cannot prevail, either at trial or on appeal, on the strength of the prima facie case alone.  The plaintiff must ultimately prove that the employer retaliated against the plaintiff by discharging, or otherwise disciplining, the plaintiff because the plaintiff engaged in a protected activity.

{¶ 52} Here, after a trial on the merits, the trial court found that Smith failed to prove a prima facie case of unlawful retaliation.  The court then went on to consider and find against Smith on the ultimate issue.  The trial court, therefore, entered judgment in defendants' favor because it found no unlawful retaliation against Smith occurred.  In his first and second assignments of error, Smith contends that the trial court erred in identifying the protected activity that he engaged in and in determining whether a causal connection existed between the protected activity and his discharge.  Thus, the first two assignments of error challenge the trial court's analysis of elements of Smith's prima facie case for retaliation, not whether the trial court erred in its ultimate finding of no retaliation.

{¶ 53} Even if Smith is correct that he established a prima facie case, he cannot prevail on appeal unless he can establish that the trial court's ultimate finding—that defendants did not unlawfully retaliate—is against the manifest weight of the evidence. The first two assignments of error do not attack the ultimate finding, so the errors alleged in those assignments are not sufficient to justify reversal.  Accordingly, we overrule Smith's first and second assignments of error.

{¶ 54} By Smith's third assignment of error, he argues that the trial court erred in ignoring the "cat's paw" theory of liability.  We disagree.

{¶ 55} A "cat's paw" is a person used by another to accomplish the other's purposes.  *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir.2006).  In the employment context, an unbiased decisionmaker is a cat's paw in situations where a

---

[2] Unlike federal appellate courts, Ohio appellate courts have the discretion to decide whether or not to review the prima facie case in an appeal after a trial on the merits.  *Mittler v. OhioHealth Corp.*, 10th Dist. No. 12AP-119, 2013-Ohio-1634, ¶ 23, citing *Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 30.  Federal appellate courts have a duty to proceed directly the ultimate question of discrimination vel non.  *Imwalle* at 545-56.

biased subordinate, who lacks decisionmaking power, uses the unbiased decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory or retaliatory employment action. *Id.* An employer may be held liable under a cat's paw theory of liability " '[w]hen an adverse * * * decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias.' " *Bishop v. Ohio Dept. of Rehab. & Corr.*, ___ Fed.Appx. ___ (6th Cir.2013), quoting *Arendale v. Memphis*, 519 F.3d 587, 604 (6th Cir.2008), fn. 13.

{¶ 56} The United States Supreme Court recently addressed the cat's paw theory of liability. In *Staub v. Proctor Hosp.*, ___ U.S. ___, 131 S.Ct. 1186 (2011), the plaintiff filed a claim against his prior employer for violation of the Uniform Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. 4301 et seq., after his employer terminated his employment. According to the plaintiff, his service in the United States Army Reserve was a motivating factor in his employer's decision to discharge him. The plaintiff alleged that, although an unbiased superior decided to fire him, the unbiased superior based her decision on complaints made by the plaintiff's immediate supervisors, who were hostile to the plaintiff's military obligations. The plaintiff sought to hold his employer liable for the discriminatory animus of his immediate supervisors under the cat's paw theory.

{¶ 57} A violation of USERRA occurs when antimilitary animus is a "motivating factor" in an employer's decision to undertake an adverse employment action against a military member. 38 U.S.C. 4311(c). The United States Supreme Court considered whether antimilitary animus could be found to be a motivating factor where the ultimate decisionmaker had no such animus but was influenced by previous employment actions that resulted from a lower-level supervisor's antimilitary animus. *Staub* at 1191. To answer that question, the court equated the traditional tort law standard of proximate cause with USERRA's "motivating factor" causation standard. The court concluded:

> So long as [a lower-level] agent intends, for discriminatory reasons, that the adverse [employment] action occur, he has the scienter required to be liable under USERRA. And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. * * * The decisionmaker's exercise of judgment is *also* a proximate cause of the

> employment decision, but it is common for injuries to have multiple proximate causes.

(Emphasis sic.)  *Id.* at 1192.  Thus, the court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  (Emphasis sic.)  *Id.* at 1194.

{¶ 58} USERRA, obviously, is a different statute than Title VII or R.C. 4112.02(I). Smith assumes that *Staub* applies to the case at bar, even though *Staub* addresses a different statutory scheme.  We cannot join Smith in this assumption.

{¶ 59} Both Title VII's and R.C. 4112.02's antiretaliation provisions make it unlawful for an employer to take adverse employment action against an employee "because" of certain criteria.  29 U.S.C. 2000e-3(a); R.C. 4112.02(I).  Recently, the United States Supreme Court analyzed the text of 29 U.S.C. 2000e-3(a) and concluded that:

> Title VII retaliation claims must be proved according to traditional principles of but-for causation * * *.  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*Univ. of Texas Southwestern Med. Ctr. v. Nassar*, __ U.S. __, 133 S.Ct. 2517, 2533 (2013).  In other words, to prevail on a retaliation claim, a plaintiff must show that retaliation is a determinative factor—not just a motivating factor—in the employer's decision to take adverse employment action.  Thus, the causation standard imposed in retaliation cases (but-for causation) is a higher standard than that applied in USERRA or Title VII discrimination claims ("motivating factor").

{¶ 60} The language of R.C. 4112.02(I) is virtually identical to 29 U.S.C. 2000e-3(a).  Due to the similarities in Title VII and R.C. Chapter 4112, Ohio courts look to federal case law addressing Title VII for assistance in interpreting R.C. Chapter 4112.  *Greer-Burger*, 116 Ohio St.3d 324, 2007-Ohio-6442, at ¶ 12.  Consequently, we conclude that R.C. 4112.02(I) also requires the plaintiff to prove that retaliation is the but-for cause of adverse employment action.

{¶ 61} A direct application of *Staub* to a retaliation case would mean that the plaintiff would only have to prove that the lower-level supervisor's retaliatory animus was

a motivating, albeit surreptitious, factor in the employment action. Retaliation cases, however, require a closer connection between retaliatory animus and the adverse employment action. *Nassar* at 2534 (recognizing that the but-for causation standard "is more demanding than the motivating-factor standard"). In retaliation cases, the plaintiff must show that the retaliatory animus was the but-for cause of the adverse employment action. *Id.* at 2533. Thus, to prevail in a retaliation case, the plaintiff has the burden of establishing that the retaliatory animus was a determinative, not merely motivating, factor. Due to the different causation standards at play, a court cannot directly apply *Staub* to a retaliation case. The question then becomes whether the holding in *Staub* can be altered to fit retaliation cases.

{¶ 62} A number of federal courts have addressed this question in the context of age discrimination cases. Age discrimination cases, like retaliation cases, require proof of but-for causation. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009). The federal courts have held that the higher causation standard does not preclude the application of *Staub*, but it does increase the plaintiff's burden of proof to recover under the cat's paw theory. The plaintiff must show that the lower-level supervisor's discriminatory animus was a "but-for" cause of, or a determinative influence on, the unbiased superior's adverse employment decision. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1337 (11th Cir.2013); *Marcus v. PQ Corp.*, 458 Fed.Appx. 207, 212 (3d Cir.2012); *Wojtanek v. Dist. No. 8, Internatl. Assn. of Machinists & Aerospace Workers, AFL-CIO*, 435 Fed.Appx. 545, 549 (7th Cir.2011); *Simmons v. Sykes Ents., Inc.*, 647 F.3d 943, 949-50 (10th Cir.2011); *Rogers v. PAR Elec. Contractors, Inc.*, N.D.Ohio No. 1:10 CV 1402 (Sept. 1, 2011), fn. 10. As the Tenth Circuit Court of Appeals explained:

> [A] supervisor's animus might be a "but-for" cause of termination where, for example, the biased supervisor falsely reports the employee violated the company's policies, which in turn leads to an investigation supported by the same supervisor and eventual termination. Or the biased supervisor may write a series of unfavorable periodic reviews which, when brought to the attention of the final decision-maker, serve as the basis for disciplinary action against the employee. But where a violation of company policy was reported through channels independent from the biased supervisor, or the undisputed evidence in the record supports the employer's assertion that it fired the employee for its own

> unbiased reasons that were sufficient in themselves to justify termination, the plaintiff's age may very well have been in play—and could even bear some direct relationship to the termination if, for instance, the biased supervisor participated in the investigation or recommended termination—but age was not a determinative cause of the employer's final decision.

*Simmons* at 950.

{¶ 63} Here, Smith seeks to hold defendants liable for Dragovich's alleged retaliatory animus under the cat's paw theory. Applying *Staub* in light of the "but-for" causation standard, we conclude that Smith could only prevail on his cat's paw theory if he established that: (1) Dragovich performed an act motivated by retaliatory animus that was intended to cause an adverse employment action, and (2) that act was the but-for cause of Smith's discharge.

{¶ 64} As to the first element, the trial court concluded that Dragovich did not act out of unlawful animus, but rather, because his personality conflicted with Smith's. Smith challenges this finding as being against the manifest weight of the evidence. Judgments supported by competent, credible evidence will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. In determining whether a judgment is against the weight of the evidence, a reviewing court presumes that the findings of the trier of fact are correct. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21.

{¶ 65} Here, the record contains evidence to support the trial court's finding of fact. Dragovich admitted to having personal issues with Smith during the 2006 administrative investigation into whether Dragovich was discriminating against Smith. Additionally, Watts, who at one point tried to mediate between Smith and Dragovich, concluded that, "[o]bviously, there was a personality conflict that needed to be managed at the post level." (Tr. 609.)

{¶ 66} In arguing to the contrary, Smith points to testimony from both Williams and Watts that they worried that Dragovich was singling Smith out for discipline. While Smith correctly recounts Williams' and Watts' testimony, that testimony merely begs the question. Dragovich and Smith indisputably had a contentious relationship; the question is why they had that relationship. Was Dragovich a strict disciplinarian due to his personal issues with Smith, or was Dragovich discriminating and retaliating against Smith

because of Smith's race and prior complaints? The trial court found the former, and as the record contains evidence to support that finding, we will not contravene it.

{¶ 67} Moreover, even if Dragovich acted against Smith with retaliatory intent, Smith did not prove that those actions were the but-for cause of Smith's termination. Dragovich conducted the first administrative investigation, but he was only a witness in the second and had virtually no involvement in the third. Dragovich never recommended any particular kind of discipline for Smith. The commander of OSHP's office of personnel first recommended that discharge was the appropriate level of discipline, and the director of the Department of Public Safety concurred and imposed that discipline.

{¶ 68} Smith, however, argues that, by choosing to initiate the three administrative investigations, Dragovich ensured that Smith would receive significant discipline. We find that the evidence shows that Dragovich could not on his own initiate the administrative investigations. As post commander, Dragovich could either discipline a post employee himself through counseling, or he could inform the district commander about the employee's alleged infraction. If Dragovich involved the district commander, then the district commander would decide whether or not to initiate an administrative investigation. For serious infractions, Dragovich had no discretion; he had to inform the district commander about the infraction. Smith presented no evidence that Smith's infractions were the type of infractions that Dragovich could handle himself without involvement of the district commander.

{¶ 69} Moreover, the advent of the administrative investigations did not guarantee that Smith would be disciplined, much less discharged. Depending on the facts uncovered in an administrative investigation, the investigation could result in no discipline, counseling, "or it could be anything * * * up to termination." (Tr. 838.) Consequently, Dragovich's action—informing the district commander about Smith's three infractions so the district commander could decide whether to conduct administrative investigations— could not be the but-for cause of Smith's discharge.

{¶ 70} Smith argues that, with regard to the first incident, Dragovich's actions went beyond merely informing the district commander of the infraction—that Smith claimed compensatory time for a court hearing that he did not attend. Smith asserts that Dragovich manipulated the district commander into approving the first administrative

investigation by misrepresenting that Smith had previously missed another court date. After Dragovich told the district commander about the first incident, the district commander authorized an administrative investigation, but only if Smith had previously missed a court appearance. Mendenhall told Dragovich that she believed that Smith had failed to appear for a court hearing in another case. However, Bluedorn, the defense attorney for that case, told Dragovich that Smith had attended all the hearings. Although Bluedorn could not remember when he told Dragovich this information, Smith contends Dragovich knew that Smith had not missed a hearing in the other case when he told the district commander otherwise. Smith asserts that this alleged misrepresentation is a retaliatory act that resulted in his discharge.

{¶ 71} Even if we credit Smith's argument and remove the first incident from consideration, OSHP senior management had before them two other incidents where untainted evidence supported the conclusion that Smith made false statements. In the administrative investigation into the second incident (where Smith and Mendenhall disagreed on whether Mendenhall told Smith that a court hearing was continued), Dragovich merely related the contents of his telephone conversations with Smith and Mendenhall. Smith does not assert or point to any evidence that Dragovich misstated the substance of those conversations. Moreover, Dragovich's recollection of his telephone conversations with Smith substantively matches the transcripts of those conversations. Therefore, we fail to see how Dragovich's supposed retaliatory animus infected the evidence collected during the second administrative investigation.

{¶ 72} In the third administrative investigation, Dragovich did no more than pass the report of the investigation up the chain of command. Dragovich, therefore, had no involvement in the collection of statements from two sergeants regarding what Smith told them about the court's ability to arraign a defendant in the absence of an original citation. Dragovich also had no involvement in Smith's interview regarding the incident.

{¶ 73} The reports from both the second and third administrative investigations include Smith's denials and explanations for his actions. OSHP gave Smith a pre-disciplinary hearing so Smith could respond to the administrative investigation reports. OSHP senior management judged the witnesses' allegations and Smith's responses, and they concluded that Smith had made false statements. As the trial court found, making

false statements is a ground for termination.  Given that OSHP senior management had unbiased reasons to justify Smith's termination, Dragovich's alleged retaliatory animus was not the but-for cause of Smith's discharge.  Even if Dragovich's supposed bias played some role in Smith's termination, Smith failed to present evidence that that role was a determinative reason for his termination.

{¶ 74} In sum, we conclude that the evidence fails to show that Dragovich performed an act motivated by retaliatory animus that was intended to cause an adverse employment action and that that act was the but-for cause of Smith's discharge.  Smith, therefore, cannot prevail on the cat's paw theory of liability.  Accordingly, we overrule Smith's third assignment of error.

{¶ 75} By his fourth assignment of error, Smith argues that the trial court's judgment on his retaliation claim was against the manifest weight of the evidence.  In our analysis of Smith's third assignment of error, we partially addressed this argument and rejected it.  We now consider the remainder of Smith's argument that competent, credible evidence does not support the defense verdict.

{¶ 76} Smith argues that a greater amount of credible evidence proves that the legitimate, nondiscriminatory reason defendants proffered for Smith's discharge was a pretext for retaliation.  In order to prevail on a claim of retaliation where the employer has articulated a legitimate, nondiscriminatory reason, the plaintiff must prove not only that the proffered reason was a pretext, but also that the real reason for the employer's action was unlawful retaliation.  *Imwalle*, 515 F.3d at 544.  In other words, it is not enough to disbelieve the employer; the trier of fact must also believe the plaintiff's explanation of intentional retaliation.  *Hicks*, 509 U.S. at 519.  However, a trier of fact may infer the ultimate fact of retaliation from the falsity of the employer's explanation.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  A trier of fact is permitted (but not compelled) to conclude the employer unlawfully retaliated based on the plaintiff's prima facie case, combined with sufficient evidence to find that the legitimate, nondiscriminatory reason is a pretext.  *Id.* at 148.  A trier of fact may not find the legitimate, nondiscriminatory reason is a pretext unless there is a sufficient basis in the evidence for doing so; "the plaintiff must produce sufficient evidence from which the [trier

of fact] may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir.1994).

{¶ 77} A plaintiff may establish pretext by proving that: (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action. *Id.* at 1084. Smith points to evidence that falls into each of these three categories.

{¶ 78} The first method for proving pretext is an attack on the credibility of the employer's proffered reason. *Id.* Under this method, the plaintiff must do more than dispute the facts on which the employer based its decision to take an adverse employment action. *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 285 (6th Cir.2012); *accord Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir.2012) ("[A] case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds for termination."); *Joostberns v. United Parcel Servs.*, 166 Fed.Appx. 783, 794 (6th Cir.2006) (under the honest belief rule, "the falsity of [the employer's] reason for terminating [the] plaintiff cannot establish pretext as a matter of law"). If an employer honestly believes in the legitimate, nondiscriminatory reason that it relied on in making its employment decision, then the employer lacks the necessary discriminatory intent. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir.1998). Consequently, where the employer holds an honest belief in its proffered reason, the employee cannot establish that the reason is pretextual even if it is later shown to be mistaken or baseless. *Tibbs v. Calvary United Methodist Church*, 505 Fed.Appx. 508, 513-14 (6th Cir.2012); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir.2001); *Wigglesworth v. Mettler Toledo Internatl., Inc.*, 10th Dist. No. 09AP-411, 2010-Ohio-1019, ¶ 19. The inquiry, therefore, must focus on whether the employer's reasons for its decision were honestly held, not on whether the employer's reasons were right.

{¶ 79} In order for an employer to claim an honest belief in its proffered reason, the employer must establish its reasonable reliance on particularized facts that were before it at the time it made the adverse employment decision. *Smith* at 807. For reasonable reliance to exist, the employer must have made a reasonably informed and considered decision before taking the adverse employment action. *Id.* "When the

employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id.* at 807-08.

{¶ 80} Here, OSHP senior management determined that Smith was untruthful during the three incidents at issue. In making that determination, OSHP senior management had before it the reports from the three administrative investigations. Those reports included statements from individuals recounting what they heard Smith say or, in Mendenhall's case, what she did not say to Smith. The reports also included Smith's written and oral statements, in which he denied making the disputed statements and offered his version of events. Thus, OSHP senior management had before it particularized facts developed through extensive investigations. OSHP assessed those facts and formed an honest belief that Smith was dishonest.

{¶ 81} Instead of challenging his employer's honest belief in its reason for terminating him, Smith contends that OSHP senior management wrongly gauged the credibility of the witnesses to the investigations. Each incident required OSHP senior management to decide whether to believe Smith's version of events or, instead, accept what other individuals said occurred. Smith now argues that the OSHP senior management was wrong when they decided to disbelieve Smith's denials and explanations. We will not second-guess the credibility determinations of OSHP senior management. OSHP extensively reviewed each incident, so senior management could reasonably rely on the particularized facts before it to decide what really happened. As OSHP senior management held an honest belief that Smith was untruthful, Smith cannot establish pretext.

{¶ 82} We next turn to analyzing the evidence offered under the third method for showing pretext. Like the first method, the third method also directly attacks the credibility of the employer's explanation for its employment decision. *Manzer*, 29 F.2d at 1084. Ordinarily, the third method consists of presenting evidence that "other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its

discharge of the plaintiff." *Id.* Any employee the plaintiff seeks to compare himself must be similar in all of the relevant aspects to the plaintiff. *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir.2003). Ordinarily, to be similarly situated, the other employees " 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " *Carson v. Patterson Cos.*, 423 Fed.Appx. 510, 513 (6th Cir.2011), quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992).

{¶ 83} Here, Smith claims that Dragovich, Harmon, Trooper Charles Mendenhall, and Trooper Donald Walker were not disciplined as harshly as he was for similar conduct. Dragovich was Smith's supervisor, so logically, he could not have dealt with the same supervisor as Smith. Consequently, Dragovich is not similarly situated to Smith. *Carson* at 513.

{¶ 84} That leaves Harmon, Mendenhall, and Walker. Smith, Harmon, Mendenhall, and Walker shared Dragovich as a supervisor, and they were all subject to the same standards. Like Smith, Harmon, Mendenhall, and Walker all exhibited dishonesty. However, in the cases of Harmon, Mendenhall, and Walker, there was only one occasion of dishonesty, not three occasions like Smith. Additionally, Mendenhall and Walker were both terminated as a result of their dishonesty. Walker, whose situation most closely matches Smith's, was only reinstated because OSHP had mishandled the administrative investigation into Walker's behavior.

{¶ 85} Given the differences in their conduct, we conclude that neither Harmon nor Mendenhall are similarly situated to Smith. *Haughton v. Orchid Automation*, 206 Fed.Appx. 524, 534 (6th Cir.2006) (where only some conduct is similar, the plaintiff does not establish comparably serious conduct). Although Walker, like Smith, committed multiple infractions, including being untruthful, OSHP senior management treated Walker just like they treated Smith. OSHP senior management discharged both men. OSHP senior management only rehired Walker because of a procedural mistake that jeopardized OSHP's chances of success in arbitration over Walker's termination. Consequently, exigencies unrelated to unlawful retaliation explain the difference in the treatment of Smith and Walker. Smith, therefore, cannot rely on Walker's situation to

prove that the proffered legitimate, nondiscriminatory reason was a pretext for retaliation.

{¶ 86} The second method for showing pretext is an indirect attack on the credibility of the legitimate, nondiscriminatory reason. *Manzer*, 29 F.2d at 1084. The plaintiff admits the factual basis underlying the employer's proffered explanation and acknowledges that such conduct could motivate dismissal. *Id.* The plaintiff challenges the credibility of the legitimate, nondiscriminatory reason "by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." (Emphasis sic.) *Id.*

{¶ 87} Here, Smith points to evidence of Dragovich's conduct as proof that his discharge was more likely the product of unlawful retaliation, and not his untruthfulness. According to Smith, Dragovich's conduct demonstrates that Dragovich was biased against him, and that Dragovich engineered, or at least influenced, his discharge because of this bias. As we concluded above, the manifest weight of the evidence establishes that Dragovich acted out of personal dislike of Smith, not unlawful animus. "[M]ere personal dislike that is unrelated to the plaintiff's [race] or protected activities will not support a claim of discrimination or retaliation under Title VII." *Skvarla v. Potter*, 109 Fed.Appx. 799, 801 (7th Cir.2004); *accord Darvishian v. Geren*, 404 Fed.Appx. 822, 830 (4th Cir.2010).

{¶ 88} In sum, we conclude that the trial court did not err in finding that Smith failed to show that the reasons for his discharge were a pretext for retaliation. The manifest weight of the evidence supports that finding. Accordingly, we overrule Smith's fourth assignment of error.

{¶ 89} By Smith's fifth assignment of error, he argues that the trial court erred in striking his request for attorney's fees under Title VII. As Smith did not prevail on his Title VII claims, this assignment of error is moot.

{¶ 90} For the foregoing reasons, we overrule Smith's first, second, third, and fourth assignments of error, render moot Smith's fifth assignment of error, and affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

TYACK and T. BRYANT, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under authority of Ohio Constitution, Article IV, Section 6(C).

_____