**[Cite as *Nebozuk v. Abercrombie & Fitch Co.*, 2014-Ohio-1600.]**

IN THE COURT OF APPEALS OF OHIO
TENTH APPELLATE DISTRICT

Brian Nebozuk, :

Plaintiff-Appellant, :

v. : No. 13AP-591
(C.P.C. No. 10CV-12102)

Abercrombie & Fitch Co. et al., :
(ACCELERATED CALENDAR)

Defendants-Appellees. :

---

D E C I S I O N

Rendered on April 15, 2014

---

*Marshall and Morrow, L.L.C.*, and *John S. Marshall*, for appellant.

*Vorys, Sater, Seymour and Pease, L.L.P.*, and *Daren Garcia*, for appellees.

---

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

**{¶ 1}** Plaintiff-appellant, Brian Nebozuk ("plaintiff"), appeals from a judgment of the Franklin County Court of Common Pleas granting the Civ.R. 56 motion for summary judgment of defendants, Abercrombie & Fitch, Co. ("Abercrombie"), Abed Karaze, Eric Russell, Christopher Matthew Green, and Tom Fogerty (collectively "defendants"). Because plaintiff failed to establish a prima facie case of retaliation, we affirm.

## I. FACTS & PROCEDURAL HISTORY

**{¶ 2}** Plaintiff filed a complaint against defendants on August 17, 2010, alleging a R.C. 4112.02 claim for retaliation. The facts giving rise to the complaint occurred

between November 2008 to April 2010, while Abercrombie employed plaintiff as a project manager in Abercrombie's store construction department. During his employment, plaintiff oversaw the construction of Abercrombie flagship stores in Tokyo, Japan and Paris, France.

**{¶ 3}** Karaze was Abercrombie's senior vice president of store design and construction. Green and Russell were both directors of flagship store construction. Green was plaintiff's direct supervisor during the first half of his employment with Abercrombie, and Russell was plaintiff's supervisor during the latter half of plaintiff's employment. Green and Russell both reported to Karaze. Karaze had the ultimate decision-making authority regarding plaintiff's employment with Abercrombie. Fogerty was Abercrombie's senior director of human resources and provided support for the store construction department.

**{¶ 4}** Plaintiff asserted that Abercrombie terminated his employment because he reported that Russell was engaging in sexual harassment in the workplace. Defendants contended that Karaze was unaware that plaintiff ever made a report concerning Russell's behavior, and noted that Karaze fired plaintiff after discovering that plaintiff had: (1) attempted to expense personal flights to New York, Hawaii, and California, and a ski trip in the French Alps, as business expenses; (2) submitted a falsified agenda; and (3) submitted a falsified expense report.

***A. Applicable Abercrombie Policies***

**{¶ 5}** Abercrombie's discrimination and sexual harassment policy prohibited any form of discrimination, and defined sexual harassment as a form of gender discrimination. The policy described sexual harassment to include "[b]ehavior of a sexual nature that is unwelcome and unreasonably interferes with job performance or creates an intimidating, hostile or offensive work environment." (Motion for Summary Judgment, exhibit No. 6.) The policy instructed employees to report any violation of the discrimination policy to human resources, or alternatively the employee could "contact an Officer of the Company, directly to report a suspected violation of this policy." (Motion for Summary Judgment, exhibit No. 6.) Abercrombie's policy on non-

fraternization provided that, if an associate became "aware of a romantic relationship involving any A&F management associate and someone under their supervision [the associate] should report it [to] Human Resources." (Motion for Summary Judgment, exhibit No. 6.)

**{¶ 6}** Abercrombie's travel and related expenses policy provided that all associates were expected to use good judgment when traveling to incur minimal costs. Each individual department would reimburse its associate "for reasonable and necessary travel and related expenses in accordance with this policy." (Motion for Summary Judgment, exhibit No. 5.) Abercrombie associates who traveled often were given a corporate credit card, which the associate had to use for all business related expenses. The travel policy cautioned that "[c]orporate credit cards should not be used for personal expenses." (Motion for Summary Judgment, exhibit No. 5.)

**{¶ 7}** Meals would be reimbursed under the travel policy if the employee provided "full documentation indicating the date, place, and amount of meals." (Motion for Summary Judgment, exhibit No. 5.) Hotel expenses would be reimbursed under the policy "only when overnight stay is required for business purposes." (Motion for Summary Judgment, exhibit No. 5.) The policy obligated each associate to create an expense report after each business trip, which the associate's supervisor would review and approve.

**{¶ 8}** As of March 22, 2010, the store construction department also required agendas from project managers traveling for business purposes. Project managers had to submit a time off request prior to booking any business trip, and had to submit "a draft trip agenda with details of each day" which had to be "approved by [the associate's] director" prior to departure. (Motion for Summary Judgment, exhibit No. 13.) The e-mail explaining the agenda policy noted that "your agenda will need to be updated and current prior to your trip." (Motion for Summary Judgment, exhibit No. 13.)

**{¶ 9}** Plaintiff's supervisors testified to the necessary protocol for an associate to follow when booking personal and business travel together. Karaze explained that the travel department would "price the whole ticket" including the personal part of the trip,

then "price it again without [the personal trip]," and the associate would "pay the difference." (Karaze Depo., 46.) The associate had to alert their supervisor before they booked a business trip which included a personal trip, and make sure that any such itinerary was "fair to the company," meaning the employee was not adding "[c]ities which [were] not plausibly on the itinerary to where you're going." (Motion for Summary Judgment, exhibit D, Green Depo., 101-02.)

***B. Russell's Misconduct & Plaintiff's Report of Russell***

**{¶ 10}** Plaintiff detailed various incidents of inappropriate workplace behavior from Russell. Plaintiff explained that Russell would make comments to plaintiff personally regarding female Abercrombie employees. Plaintiff stated Russell would say things like " 'Check out her skirt,' or, * * * 'She comes to town often, and she could break up my marriage.' " (Nebozuk Depo., 66.) Plaintiff stated how Russell would hug female coworkers "where the hand slips * * * [s]liding down, you know, towards, * * * the buttocks." (Nebozuk Depo., 76.) Plaintiff explained that he observed Russell give "very selective treatment" to an Abercrombie employee, Susan Schuller, noting that Russell would shovel snow off her car in the winter, bring her treats from the café, and once left a note on her car after a Columbus Blue Jackets game. (Nebozuk Depo., 64.) Plaintiff also described an incident which occurred in Tokyo where Russell had models give him high fives, causing them to jump and their skirts to fly up.

**{¶ 11}** Plaintiff also claimed that he witnessed Russell in an inappropriate relationship with Addie Wray, an associate in Abercrombie's new stores department. Plaintiff asserted that Russell once stayed in Wray's hotel room while they were working in Tokyo. Wray and Russell both denied that Russell ever stayed in a hotel room with Wray in Tokyo. Plaintiff observed "constant private meals, * * * constant private meetings, constant private coffee trips" between Wray and Russell, noting that they "drove in together" and "left together," and just made "a distinct effort to spend time together." (Nebozuk Depo., 88, 108.) Plaintiff explained that Wray and Russell would forget to include others, such as plaintiff and Wray's supervisor Teresa De La Rosa, in on important business information.

**{¶ 12}** The record indicates that De La Rosa approached Amy Jo Yoakum, an Abercrombie human resources employee, in early March 2010 and asked Yoakum to speak to Wray about her relationship with Russell. Yoakum explained that some Abercrombie associates referred to Russell as the "creepy construction guy," as Russell made them feel uncomfortable. (Yoakum Depo., 16.) Yoakum sent an email to Fogerty on March 3, 2010, stating that eight associates had "voiced concerns about Russell's behavior," noting that the associates indicated that Russell "makes comments, touches them, hugs them, and jokes with them in a way that they perceive as inappropriate." (Yoakum Depo., exhibit S.) The email noted that Karaze was "not aware of the concerns" regarding Russell. (Yoakum Depo., exhibit S.) Yoakum said she spoke to Wray in early March 2010, and Wray told Yoakum that she was not in a romantic relationship with Russell, as they were just friends. Both Wray and Russell admitted that they were engaged in a sexual, romantic relationship with each other by April 2010.

**{¶ 13}** Plaintiff asserted that he reported Russell's inappropriate behavior to both Green and De La Rosa. De La Rosa testified that she and plaintiff, as well as others, frequently "gossiped, talked, [and] joked about" the budding romantic relationship between Wray and Russell. (Motion for Summary Judgment, exhibit F; De La Rosa Depo., 33.) De La Rosa stated that plaintiff only expressed to her that he thought that Wray and Russell's relationship was inappropriate "being that [Russell] was married." (Motion for Summary Judgment, exhibit F, De La Rosa Depo., 43.) De La Rosa also stated that, while she and her associates "laughed and joked" about Russell hugging others, "[n]one of [her] associates complained to [her] about [Russell] hugging." (Motion for Summary Judgment, exhibit F; De La Rosa Depo., 41.)

**{¶ 14}** Plaintiff stated that he made his "most official complaint" regarding Russell in March 2010, when he was out to dinner with Green in Paris. (Nebozuk Depo., 119.) Plaintiff explained that, during the dinner, he "expressed [his] concern with how [Russell was] showing preferential treatment to Addie, their inappropriate – what [plaintiff] deemed as an inappropriate relationship between the two of them in [Tokyo], [and] how it was affecting [plaintiff's] work." (Nebozuk Depo., 119.) Plaintiff told Green

that Russell and Wray had shared a hotel room in Tokyo. Plaintiff stated that Green already knew about Russell hugging female associates, as there was "no secret in the office that [Russell] hugs the * * * the more pretty, the more beautiful women in the group." (Nebozuk Depo., 120-21.) Plaintiff asserted that, during the March 2010 dinner in Paris Green told him "not to go to human resources," as Green said that going to human resources could "open up a whole other can of worms, and HR – reporting to HR was not a safe thing to do at the company." (Nebozuk Depo., 125, 132.)

**{¶ 15}** Green stated that, during the March 2010 dinner in Paris, plaintiff "speculated" to him that Wray and Russell "were having an affair." (Motion for Summary Judgment, exhibit D; Green Depo., 88.) Green stated that his reaction to this information was that "it was gossip and it had nothing to do with anything," noting that he believed plaintiff was simply "venting to [Green] about frustrations he had with [his] supervisor." (Motion for Summary Judgment, exhibit D; Green Depo., 91-92.) Green also stated that plaintiff never expressed a desire to report Russell to human resources.

***C. Plaintiff's Misconduct***

**{¶ 16}** Karaze stated that he fired plaintiff for plaintiff's multiple attempts to expense personal travel as a business expense and other conduct which indicated that plaintiff was not an honest employee. The first incident occurred in July 2009, when plaintiff had to go to a wedding in Niagara Falls over a weekend, and had to be at the Tokyo store the following Monday.

**{¶ 17}** Abercrombie's travel department booked flights for plaintiff from Columbus, Ohio to Buffalo, New York for Friday, July 17, 2009, and from Buffalo to Tokyo for Sunday, July 19, 2009. The invoice from the travel department indicates that they booked these flights on July 1, 2009. Plaintiff submitted the entire trip as a business expense on his expense report. Green reviewed the expense report, confronted plaintiff about the Buffalo portion, and told plaintiff it was improper to have included that leg of the trip as a business expense. Green "specifically told [plaintiff] that he should never book a trip this way without getting it approved first so that whatever the personal reimbursement was going to be could be decided ahead of time." (Motion for

Summary Judgment, exhibit D; Green Depo., 102.) Green had plaintiff reimburse the company for the Buffalo portion of the trip.

**{¶ 18}** In September 2009, plaintiff had to attend his own wedding in Hawaii and wedding reception in San Francisco. Plaintiff was still working on the Tokyo store at that time. Abercrombie's travel department booked flights for plaintiff from Columbus to Hawaii for Wednesday, September 2, 2009, from Hawaii to San Francisco, California for Friday, September 11, 2009, and from San Francisco to Tokyo for Monday, September 14, 2009. The invoice from the Abercrombie travel department indicates that they booked these flights on June 12, 2009. Plaintiff submitted the entire trip as a business expense.

**{¶ 19}** Green reviewed plaintiff's expense report containing the Hawaii/San Francisco trip and confronted plaintiff about the personal part of the trip. Green stated he told plaintiff that trying to expense personal travel like this "could be likened to stealing from the company and that that was highly inappropriate." (Motion for Summary Judgment, exhibit D; Green Depo., 105.) Green deducted the amounts for the Hawaii and San Francisco flights, and required plaintiff to repay the company for that portion of the trip. Green noted that, if he had not caught the Buffalo, Hawaii, or San Francisco flights, "the company would have paid for [those trips] on [plaintiff's] behalf." (Motion for Summary Judgment, exhibit E; Russell Depo., 80.)

**{¶ 20}** Plaintiff admitted that Green spoke to him about both these incidents, and told plaintiff to "make sure we talk about this [i.e. including personal travel in business travel], and make sure travel plans are discussed with [Green] prior to booking them." (Nebozuk Depo., 159.) After the Buffalo and Hawaii trips, plaintiff knew that he "needed to discuss that with [Green] in advance and get the printout of the – any leg of the trip that wasn't business related in – you know, in front of him from the get-go." (Nebozuk Depo., 160.) Plaintiff asserted in his deposition that he saved the company money by booking his personal flights along with his business flights, but admitted that he never told Green, Russell, or Karaze that he booked these personal flights in order to save the company money.

**{¶ 21}** Following the successful opening of the Tokyo store, plaintiff began working on the opening of an Abercrombie flagship store in Paris. Tanya Lipton was the principal architect for the Paris store. Lipton and plaintiff became friends while working on the Paris store together. Plaintiff stated that, during their first meeting in Paris, plaintiff and Lipton began to talk about taking a ski trip together, along with Lipton's husband.

**{¶ 22}** Plaintiff's final trip to the Paris store occurred in April 2010. Per the store construction department travel policy, plaintiff submitted a time-off request for the April Paris site visit. Russell was plaintiff's supervisor while plaintiff was working on the Paris store, and noted that plaintiff submitted his time-off request for the April Paris site visit on March 18, 2010. Plaintiff also submitted a draft version of his agenda for the trip along with his time-off request. The draft agenda demonstrated that plaintiff would be in Paris for eight days, spanning a weekend, and indicated that plaintiff had a meeting at 2:00 p.m. on Friday April 9, 2010, and a 10:00 a.m. meeting on Saturday, April 10, 2010. Russell noted that plaintiff called him immediately after submitting the request-off form and pushed Russell to approve the time off request. Russell was concerned by plaintiff's "desire to get [him] to approve this time off request so immediately" when it was not clear "why he needed to be gone eight days and over the weekend." (Motion for Summary Judgment, exhibit E; Russell Depo., 47.) Karaze preferred that his employees confine their business travel to weekdays. Accordingly, Russell asked plaintiff to submit a more detailed agenda for the trip.

**{¶ 23}** Plaintiff submitted his final site visit agenda on April 7, 2010. The revised agenda showed that plaintiff would be in meetings until 5:00 p.m. on Friday April 9, 2010, and that plaintiff would be in a design/code review meeting from 9:00 a.m. to 5:00 p.m. on Saturday, April 10, 2010. The only listed attendees for the Saturday meeting were plaintiff and Lipton; the listed location for the Saturday meeting was 10, rue du Colisee, Paris, which was the address of Lipton's office. Russell noted that, in the final agenda, "the location [for the Saturday meeting was] very specifically * * * [Lipton's] office in Paris." (Motion for Summary Judgment, exhibit E; Russell Depo.,

52.) The agenda indicated that plaintiff would have the day off on Sunday. (Motion for Summary Judgment, exhibit No. 15.)

**{¶ 24}** Abercrombie's travel department booked all the flights and hotels for plaintiff's April Paris site visit. The itinerary showed that plaintiff would check into hotels in Paris on Thursday, April 8, 2010 and Sunday, April 11, 2010. The itinerary showed that plaintiff would check into the Best Western in Chamonix, France on Friday, April 9, 2010, and check out on Sunday, April 11, 2010.[1] The receipt from the Best Western in Chamonix showed that the reservation for the room there was made on March 31, 2010. (Motion for Summary Judgment, exhibit No. 19.)

**{¶ 25}** Plaintiff admitted he was not in Paris on Saturday April 10, 2010, as he was skiing in Chamonix with Lipton and her husband. Plaintiff admitted that he did not tell any of his supervisors ahead of time that he intended to go skiing that Saturday, asserting that he did not have to because Saturday "was a day off" and he was "not required to tell anybody what [he] do[es] on [his] day off." (Nebozuk Depo., 220.) Plaintiff also claimed that he, Lipton, and her husband, did work "the entire way up to the mountain, [and] * * * we worked on Sunday on the way back," and even asserted that they worked "on the ski lift." (Nebozuk Depo., 218, 328.) Plaintiff asserted that he did not intentionally lie on his final agenda, which indicated that he would be in Paris for an all day meeting on Saturday, April 10, as he claimed that writing Paris down for the location of the Saturday meeting was simply "a mistake – definitely a mistake for not updating the agenda, * * * just human error." (Nebozuk Depo., 218.)

**{¶ 26}** Plaintiff submitted his entire April Paris trip, including the hotel and meals from Chamonix, as a business expense in his expense report. Although plaintiff submitted his receipts from the Chamonix hotel and meals with his expense report, the expense report itself did not indicate that plaintiff was in Chamonix that weekend. On the expense report, plaintiff listed the city for the Best Western and the meals from the Chamonix weekend as all having been in Paris. Plaintiff explained this discrepancy by asserting he completed the expense report using a new iPhone app. Plaintiff claimed in

[1] Chamonix is located approximately 373 miles (600 kilometers) southeast from Paris.

using the app, "the city prepopulate[d] [as Paris] and [plaintiff] just kept it," instead of changing it to Chamonix. (Nebozuk Depo., 233.) Russell asserted that plaintiff would have "had to manually go in and change the city name from Chamonix, or whatever would have popped up for this Best Western and these other receipts to Paris." (Motion for Summary Judgment, exhibit E; Russell Depo., 88-89.) Russell noted that, after reviewing the expense report and the Chamonix hotel receipt showing the date the hotel rooms were booked, it was clear that plaintiff "had made the decision to go skiing on that weekend long before he submitted that final agenda * * * which clearly showed me he was going to be in Paris doing work." (Motion for Summary Judgment, exhibit E; Russell Depo., 49.)

**{¶ 27}** Green and Russell confronted plaintiff regarding the discrepancies in his Paris expense report. Russell asked plaintiff why he stayed at three different hotels that week, and plaintiff said "they were all sold out and he had to keep changing hotels." (Motion for Summary Judgment, exhibit E; Russell Depo., 79.) When Russell asked plaintiff if they were sold out of all hotels within 500 kilometers of each other, plaintiff's "reaction was, 'Wow, I guess you caught me. I went skiing.' " (Motion for Summary Judgment, exhibit E; Russell Depo., 79.) Plaintiff asked Russell and Green if he could just pay the company back for the cost of the trip, but Russell and Green explained to plaintiff that the "bigger concern about this is that it wasn't sort of a first-time thing, that these other two events had taken place where you booked personal travel into your business travel without any prior knowledge or any prior approval from anybody." (Motion for Summary Judgment, exhibit E; Russell Depo., 80.)

**{¶ 28}** Russell and Green then called Karaze and told him about the situation involving plaintiff, explaining to Karaze that plaintiff "didn't follow the agenda. He went skiing and he is expensing the report." (Karaze Depo., 64.) Green stated they informed Karaze about how the expense report listed Paris as the city for the Best Western located in Chamonix. Green and Russell told Karaze "about the timing of the agenda and when the trip was booked and when the agenda had been written and the timing of the agenda going through its various stages and how that matched with when the hotels were

booked." (Motion for Summary Judgment, exhibit D; Green Depo., 150.) Karaze stated that he reviewed the agenda and the receipt for the Chamonix hotel, and determined that it was "obvious that [plaintiff] manipulated the agenda to his personal use, to spend the weekend and have fun." (Karaze Depo., 89.) Green stated that they also talked about plaintiff's previous trips to Buffalo and Hawaii, "because they showed a history of the same -- of similar expense behavior, we thought." (Motion for Summary Judgment, exhibit D; Green Depo., 147.) Karaze told Russell and Green to present the facts of the situation to Fogerty.

**{¶ 29}** Green and Russell presented the same facts regarding plaintiff's conduct to Fogerty. Karaze and Fogerty then met, and Fogerty explained to Karaze that the expense report "anomalies were such and the submissions were such that they constituted a serious infraction of our policy and our standards." (Motion for Summary Judgment, exhibit C; Fogerty Depo., 79.) Fogerty also explained to Karaze that there was "precedent * * * that in previous cases, that a similar situation, an individual was terminated." (Motion for Summary Judgment, exhibit C; Fogerty Depo., 79-80.) Karaze determined that plaintiff's conduct regarding the trips, the agenda, and expense report demonstrated that plaintiff was "a dishonest person," and Karaze concluded that he needed to fire plaintiff because it was not Abercrombie's "policy to keep people dishonest in our company." (Karaze Depo., 57.) Karaze sent Fogerty to fire plaintiff.

**{¶ 30}** When Fogerty told plaintiff he was being let go, plaintiff asked to speak to Karaze. Plaintiff told Karaze, "I'm sorry, I F'd up. * * * Give me another chance," and Karaze said "I'm sorry. The decision is final." (Karaze Depo., 59.) Plaintiff acknowledged that the "reason stated" for his termination "was that [he] falsified company – company documents, which happened to be an agenda," and that there was "no trust within the group." (Nebozuk Depo., 254-55.)

**{¶ 31}** When asked whether he knew that plaintiff had complained to either Russell or Green about Russell's behavior, Karaze responded "Nope. * * * The first time I heard was * * * when the case was filed." (Karaze Depo., 103-04.) Karaze reiterated that he fired plaintiff because he was a "dishonest employee because of the history," and

noted that it was really Karaze's "own decision based on all these facts and the history and, really, [plaintiff was] the wrong person for the company and for [his] department." (Karaze Depo., 113.)

***D. Trial Court Proceedings***

**{¶ 32}** Defendants filed a Civ.R. 56 motion for summary judgment on October 21, 2011, noting that plaintiff was "terminated as a result of his repeated dishonesty," and that there was no evidence that plaintiff engaged in protected conduct, as plaintiff's conversations with Green and De La Rosa about Russell "amounted to nothing more than gossip." (Motion for Summary Judgment, 1, 11.) Defendants further noted that there was no evidence indicating that Karaze knew that plaintiff had made a report regarding Russell. Due to the overwhelming evidence of plaintiff's own misconduct, defendants asserted that there was no causal connection between plaintiff's alleged report on Russell and plaintiff's termination.

**{¶ 33}** Plaintiff filed a memorandum in opposition to defendants' motion for summary judgment on November 15, 2011. Plaintiff asserted that Karaze's "(feigned) ignorance" of plaintiff's report of Russell's behavior was "unavailing." (Memorandum in Opposition, 14.) Plaintiff asserted that Green's and Russell's retaliatory motive "poisoned the well" and "tainted the decision" to terminate plaintiff. (Memorandum in Opposition, 14.) Plaintiff acknowledged that the "expense account improprieties and misconduct toward others could have motivated" defendants' decision to terminate his employment, but asserted that the "timing proximity" between his March 2010 dinner with Green, and his termination in late April 2010, demonstrated that he was discharged as a result of a retaliatory motive. (Plaintiff's Memo in Opposition, 14.) Defendants filed a reply in support of their motion for summary judgment on December 2, 2011.

**{¶ 34}** On June 12, 2013, the trial court issued a decision and entry granting the defendants' motion for summary judgment. The court noted that there was "no direct evidence that Russell knew Plaintiff had complained to Green and there [was] no direct or circumstantial evidence that Karaze was aware of Plaintiff's 'concerns' about Russell

or Plaintiff's complaint to Green in March, 2010." (Decision and Entry, 4.) The court also noted that there was "no evidence to suggest that the information given to Karaze prior to the termination of Plaintiff," regarding plaintiff's misconduct, "was false or presented to Karaze is any manner to suggest facts that did not occur." (Decision and Entry, 5.) The court found that plaintiff failed to establish a prima facie case of retaliation, as he failed to demonstrate a causal connection between his alleged protected activity and his termination. The court noted that the temporal proximity claim was insufficient to establish causation, and noted that the "admitted wrong doing by Plaintiff regarding his expenses in France was closer in time to his termination than was the March conversation with Green." (Decision and Entry, 11.) The court observed that there was "overwhelming evidence that Plaintiff's expense falsities were the sole reason for his termination." (Decision and Entry, 11.)

## II. ASSIGNMENTS OF ERROR

**{¶ 35}** Plaintiff appeals, assigning the following errors:

> [I.] IN GRANTING SUMMARY JUDGMENT, THE TRIAL COURT ERRED BY FIXATING ON THE IGNORANCE OF THE ULTIMATE DECISIONMAKER ABOUT PROTECTED ACTIVITY RATHER THAN APPLYING THE CAT'S PAW THEORY TO IMPUTE TO THE EMPLOYER THE RETALIATORY BIAS OF SUPERVISORS ON WHOSE INPUT THE ULTIMATE DECISIONMAKER RELIED.
>
> [II.] IN GRANTING SUMMARY JUDGMENT, THE TRIAL COURT ERRED BY FAILING TO RECOGNIZE THAT MORE THAN ONE PROXIMATE CAUSE MAY EXIST FOR A RETALIATORY DISCHARGE IN VIOLATION OF R.C. 4112.02(I).

## III. STANDARD OF REVIEW

**{¶ 36}** Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal*

*v. Star Bank Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

**{¶ 37}** Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

**{¶ 38}** When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.* If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Id.*

**{¶ 39}** Plaintiff's complaint asserted a claim for retaliation under R.C. 4112.02(I). R.C. 4112.02(I) provides that it is an unlawful discriminatory practice "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, * * * or participated in any manner in any" R.C. Chapter 4112

"investigation, proceeding, or hearing." A plaintiff may prove a retaliation claim through either direct or circumstantial evidence that unlawful retaliation motivated the employer's adverse employment decision. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir.2008); *Reid v. Plainsboro Partners, III*, 10th Dist. No. 09AP-442, 2010-Ohio-4373, ¶ 55. Direct evidence is that evidence which, if believed, requires no inferences to establish that unlawful retaliation was the reason for the employer's action. *Imwalle* at 543-44.

**{¶ 40}** When a plaintiff lacks direct evidence, he or she may establish retaliation through circumstantial evidence using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Imwalle* at 544. Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a prima facie case of retaliation. *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). To establish a prima facie case of retaliation under R.C. 4112.02(I), plaintiff had to establish the following: (1) he engaged in protected activity; (2) Abercrombie knew of his participation in protected activity; (3) Abercrombie engaged in retaliatory conduct; and (4) a causal link exists between the protected activity and the adverse action. *Imwalle* at 544. The establishment of a prima facie case creates a presumption that the employer unlawfully retaliated against the plaintiff.

**{¶ 41}** Once a plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate nondiscriminatory reason for" its action. *Carney v. Cleveland Hts.-Univ. Hts. City School Dist.*, 143 Ohio App.3d 415, 429 (8th Dist.2001), citing *Burdine* at 252-53. If the employer carries its burden, then the burden shifts back to the plaintiff to prove that their employer's stated reason is a pretext for discrimination. *Id.*, citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). *See also Brown v. Renter's Choice, Inc.*, 55 F.Supp.2d 788, 795 (N.D.Ohio 1999), quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984) (noting that "[a]n employer may make employment decisions 'for a good

reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason' ").

## IV. PLAINTIFF'S ASSIGNMENTS OF ERROR: CAUSATION

**{¶ 42}** Plaintiff's two assignments of error are interrelated and will be addressed together. Both assignments of error contend that the trial court erred in its analysis of the causation element of the prima facie case.

**{¶ 43}** Under his first assignment of error, plaintiff asserts that the trial court erred by failing to consider a cat's paw theory of causation. *See Bishop v. Ohio Dept. of Rehab. & Corr.*, 6th Cir. No. 10-3399 (July 9, 2013) (explaining a " 'cat's-paw' or 'rubber-stamp' theory of liability"). Plaintiff contends that "[i]n determining causation, Ohio law should follow the standards reaffirmed in *Staub* [*v. Proctor Hosp.*, __ U.S. __, 131 S.Ct. 1186 (2011)] and applied to federal retaliation claims in general." (Appellant's brief, 19.)[2] Specifically, plaintiff asserts that, had the trial court applied a cat's paw theory of causation, it would have determined that a genuine issue of material fact existed regarding whether Karaze was duped into acting as a conduit for Green's and Russell's retaliatory animus.

**{¶ 44}** Plaintiff's second assignment of error asserts that the trial court erred by failing to apply the principal of dual causation to the instant retaliation claim. Plaintiff asserts a jury should be permitted to determine that his supervisors' retaliatory animus "combined with the discrepancies in the expense reports to produce termination." (Appellant's brief, 29.)

**{¶ 45}** For the reasons that follow, we find that plaintiff failed to establish causation under a cat's paw theory and that dual causation is inapplicable to a R.C. 4112.02(I) retaliation claim. Both of plaintiff's assignments of error are resolved by this court's application of a cat's paw theory of liability to a R.C. 4112.02(I) retaliation claim

---

[2] In *Staub*, the court explained that "[t]he term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990." *Staub* at 1190, fn.1. In Aesop's fable, "a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub* at 1190, fn.1.

in *Smith v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210. In *Smith*, we held as follows:

> By Smith's third assignment of error, he argues that the trial court erred in ignoring the "cat's paw" theory of liability. We disagree.
>
> A "cat's paw" is a person used by another to accomplish the other's purposes. *EEOC v. BCI Coca–Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir.2006). In the employment context, an unbiased decisionmaker is a cat's paw in situations where a biased subordinate, who lacks decisionmaking power, uses the unbiased decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory or retaliatory employment action. *Id*. An employer may be held liable under a cat's paw theory of liability " '[w]hen an adverse * * * decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias.' " *Bishop v. Ohio Dept. of Rehab. & Corr.*, 529 Fed.Appx. 685, 2013 WL 3388481 (6th Cir.2013), quoting *Arendale v. Memphis*, 519 F.3d 587, 604 (6th Cir.2008), fn. 13.
>
> The United States Supreme Court recently addressed the cat's paw theory of liability. In *Staub v. Proctor Hosp.*, ––– U.S. ––––, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011), the plaintiff filed a claim against his prior employer for violation of the Uniform Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. 4301 et seq., after his employer terminated his employment. According to the plaintiff, his service in the United States Army Reserve was a motivating factor in his employer's decision to discharge him. The plaintiff alleged that, although an unbiased superior decided to fire him, the unbiased superior based her decision on complaints made by the plaintiff's immediate supervisors, who were hostile to the plaintiff's military obligations. The plaintiff sought to hold his employer liable for the discriminatory animus of his immediate supervisors under the cat's paw theory.
>
> A violation of USERRA occurs when antimilitary animus is a "motivating factor" in an employer's decision to undertake an adverse employment action against a military member. 38 U.S.C. 4311(c). The United States Supreme Court considered

whether antimilitary animus could be found to be a motivating factor where the ultimate decisionmaker had no such animus but was influenced by previous employment actions that resulted from a lower-level supervisor's antimilitary animus. *Staub,* ––– U.S. ––––, 131 S.Ct. at 1191, 179 L.Ed.2d 144. To answer that question, the court equated the traditional tort law standard of proximate cause with USERRA's "motivating factor" causation standard. The court concluded:

So long as [a lower-level] agent intends, for discriminatory reasons, that the adverse [employment] action occur, he has the scienter required to be liable under USERRA. And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. * * * The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes.

(Emphasis sic.) *Id.,* ––– U.S. ––––, 131 S.Ct. at 1192, 179 L.Ed.2d 144. Thus, the court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." (Emphasis sic.) *Id.,* ––– U.S. ––––, 131 S.Ct. at 1194, 179 L.Ed.2d 144.

USERRA, obviously, is a different statute than Title VII or R.C. 4112.02(I). Smith assumes that *Staub* applies to the case at bar, even though *Staub* addresses a different statutory scheme. We cannot join Smith in this assumption.

Both Title VII's and R.C. 4112.02's antiretaliation provisions make it unlawful for an employer to take adverse employment action against an employee "because" of certain criteria. 42 U.S.C. 2000e–3(a); R.C. 4112.02(I). Recently, the United States Supreme Court analyzed the text of 42 U.S.C. 2000e–3(a) and concluded that:

Title VII retaliation claims must be proved according to traditional principles of but-for causation * * *. This requires

proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*Univ. of Texas Southwestern Med. Ctr. v. Nassar,* ––– U.S. ––––, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013). In other words, to prevail on a retaliation claim, a plaintiff must show that retaliation is a determinative factor—not just a motivating factor—in the employer's decision to take adverse employment action. Thus, the causation standard imposed in retaliation cases (but-for causation) is a higher standard than that applied in USERRA or Title VII discrimination claims ("motivating factor").

The language of R.C. 4112.02(I) is virtually identical to 42 U.S.C. 2000e–3(a). Due to the similarities in Title VII and R.C. Chapter 4112, Ohio courts look to federal case law addressing Title VII for assistance in interpreting R.C. Chapter 4112. *Greer–Burger,* 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, at ¶ 12. Consequently, we conclude that R.C. 4112.02(I) also requires the plaintiff to prove that retaliation is the but-for cause of adverse employment action.

A direct application of *Staub* to a retaliation case would mean that the plaintiff would only have to prove that the lower-level supervisor's retaliatory animus was a motivating, albeit surreptitious, factor in the employment action. Retaliation cases, however, require a closer connection between retaliatory animus and the adverse employment action. *Nassar,* –––U.S. ––––, 133 S.Ct. at 2534, 186 L.Ed.2d 503 (recognizing that the but-for causation standard "is more demanding than the motivating-factor standard"). In retaliation cases, the plaintiff must show that the retaliatory animus was the but-for cause of the adverse employment action. *Id.,* ––– U.S. ––––, 133 S.Ct. at 2533, 186 L.Ed.2d 503. Thus, to prevail in a retaliation case, the plaintiff has the burden of establishing that the retaliatory animus was a determinative, not merely motivating, factor. Due to the different causation standards at play, a court cannot directly apply *Staub* to a retaliation case. The question then becomes whether the holding in *Staub* can be altered to fit retaliation cases.

A number of federal courts have addressed this question in the context of age discrimination cases. Age discrimination cases, like retaliation cases, require proof of but-for causation. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). The federal courts have held that the higher causation standard does not preclude the application of *Staub*, but it does increase the plaintiff's burden of proof to recover under the cat's paw theory. The plaintiff must show that the lower-level supervisor's discriminatory animus was a "but-for" cause of, or a determinative influence on, the unbiased superior's adverse employment decision. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1337 (11th Cir.2013); *Marcus v. PQ Corp.*, 458 Fed.Appx. 207, 212 (3d Cir.2012); *Wojtanek v. Dist. No. 8, Internatl. Assn. of Machinists & Aerospace Workers, AFL–CIO*, 435 Fed.Appx. 545, 549 (7th Cir.2011); *Simmons v. Sykes Ents., Inc.*, 647 F.3d 943, 949–50 (10th Cir.2011); *Rogers v. PAR Elec. Contractors, Inc.*, N.D.Ohio No. 1:10 CV 1402, 2011 WL 3862089 (Sept. 1, 2011), fn. 10. As the Tenth Circuit Court of Appeals explained:

[A] supervisor's animus might be a "but-for" cause of termination where, for example, the biased supervisor falsely reports the employee violated the company's policies, which in turn leads to an investigation supported by the same supervisor and eventual termination. Or the biased supervisor may write a series of unfavorable periodic reviews which, when brought to the attention of the final decision-maker, serve as the basis for disciplinary action against the employee. But where a violation of company policy was reported through channels independent from the biased supervisor, or the undisputed evidence in the record supports the employer's assertion that it fired the employee for its own unbiased reasons that were sufficient in themselves to justify termination, the plaintiff's age may very well have been in play—and could even bear some direct relationship to the termination if, for instance, the biased supervisor participated in the investigation or recommended termination—but age was not a determinative cause of the employer's final decision.

*Simmons* at 950.

> Here, Smith seeks to hold defendants liable for Dragovich's alleged retaliatory animus under the cat's paw theory. Applying *Staub* in light of the "but-for" causation standard, we conclude that Smith could only prevail on his cat's paw theory if he established that: (1) Dragovich performed an act motivated by retaliatory animus that was intended to cause an adverse employment action, and (2) that act was the but-for cause of Smith's discharge.

*Smith* at ¶ 54-63.

**{¶ 46}** Pursuant to *Smith*, plaintiff could prevail under a cat's paw theory if he established that: (1) Green and Russell performed an act motivated by a retaliatory animus which was intended to cause an adverse employment action, and (2) that act was the but-for cause of plaintiff's discharge. The evidence does not support either prong of this modified cat's paw analysis.

**{¶ 47}** There is no indication in the record that Green and Russell informed Karaze of plaintiff's attempts to expense his personal trips, and of plaintiff's falsified agenda and expense report, because plaintiff had reported Russell's conduct to Green. Russell and Green informed Karaze about plaintiff's misdeeds because Russell and Green were plaintiff's supervisors, and plaintiff engaged in the above described misconduct. Russell and Green had defended plaintiff's agenda to Karaze before plaintiff left for the Paris trip. Accordingly, Green and Russell had to tell Karaze about the Chamonix trip, "because [they] had asserted his agenda in order to justify the trip to [Karaze]," and "by using the weekend for skiing instead of having the meetings that were in the agenda,* * * [plaintiff] had turned [Green and Russell] into liars to [their] supervisor." (Motion for Summary Judgment, exhibit D; Green Depo., 147.)

**{¶ 48}** Plaintiff asserts throughout his appellate brief that Karaze heard "false or grossly exaggerated reports of dishonesty." (Appellant's brief, 22.) However, plaintiff fails to point to evidence demonstrating that Green and Russell provided Karaze with false or grossly exaggerated information regarding plaintiff's conduct. Russell explained that all he "did with Mr. Karaze was present the facts, that this," the final published agenda, "was what we signed up for [plaintiff] to travel for. This is what [plaintiff]

actually did." (Motion for Summary Judgment, exhibit E; Russell Depo., 91.) The record demonstrates that Russell and Green merely reported the actual facts of plaintiff's conduct to Karaze. Thus, the instant case does not present a situation where a biased, mid-level supervisor presented the ultimate decision maker with false information in order to secure the plaintiff's termination. Rather, Green and Russell simply reported the facts of plaintiff's conduct to Karaze, and Karaze independently determined that plaintiff's conduct necessitated termination.

**{¶ 49}** The undisputed evidence in the record supports Abercrombie's assertion that it fired plaintiff due to its own unbiased reasons; specifically, plaintiff's continued attempts to have the company pay for his personal travel and his blatant dishonesty on company documents. Karaze stated that the falsified agenda showed a lack of integrity, and "that's the basis for me firing [plaintiff]." (Karaze Depo., 96.) Plaintiff acknowledged that the reason for his termination was that his superiors had "lost trust" in him because he "falsified * * * company documents." (Nebozuk Depo., 253-54.) In light of the evidence of plaintiff's misconduct, which was sufficient in itself to justify plaintiff's termination, even if plaintiff could establish that Russell's or Green's retaliatory animus played some role in his termination, plaintiff could not establish retaliation was the but-for cause of his termination. *See Smith* at ¶ 73 (noting that the "OSHP senior management had unbiased reasons to justify Smith's termination, Dragovich's alleged retaliatory animus was not the but-for cause of Smith's discharge").

**{¶ 50}** Plaintiff asserts that a jury "could find it unreasonable to treat [plaintiff's] expense report as grounds for termination, especially when the ultimate decisionmaker could not even explain how the report's clear references to the location and timing of the ski trip could be so duplicitous as to warrant termination." (Appellant's brief, 28.) Plaintiff appears to assert that, because he submitted his receipts from the Chamonix trip with his expense report, he was honest with his employer and was not trying to hide the Chamonix trip. Although plaintiff submitted the receipts which demonstrated he had been in Chamonix, he allowed his expense report to reflect that the city for all of the charges from the Chamonix weekend occurred in Paris. Plaintiff also did not alert his

supervisors that the iPhone app. precluded him from entering the correct city in his expense report. Moreover, prior to leaving for Paris, plaintiff submitted the agenda which clearly stated that he would be working in Paris on Saturday, April 10, when plaintiff had no intention of being in Paris that Saturday.

**{¶ 51}** Plaintiff failed to present Civ.R. 56(C) evidence to establish a causal connection between his alleged protected activity and his termination under the modified cat's paw theory of liability explained in *Smith*. As such, plaintiff failed to establish a prima facie case of retaliation. *See Dautartas v. Abbott Laboratories*, 10th Dist. No. 11AP-706, 2012-Ohio-1709, ¶ 42 (noting that the "[a]ppellant's failure to establish a prima facie case * * * effectively ends [this court's] inquiry as a matter of law," and thus there was no reason to "proceed to the next two parts of the *McDonnell Douglas* analysis").

**{¶ 52}** Based on the foregoing, plaintiff's first assignment of error is overruled.

**{¶ 53}** Plaintiff's second assignment of error asserts that this court should accept and apply a theory of dual causation to retaliation claims under R.C. 4112.02(I). Dual causation refers to a principal in tort law which holds that " 'when two factors combine to produce damage or illness, each is a proximate cause.' " *Johnson v. Babcock & Wilcox Co.*, 9th Dist. No. 16144 (Nov. 17, 1993), quoting *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 587 (1991). R.C. 4112.02(I) requires plaintiff to prove that retaliation was the but-for cause of the adverse employment action. *Smith* at ¶ 60. Accordingly, the principal of dual causation is inapplicable to the instant action, and plaintiff's second assignment of error is overruled.

## V. DISPOSITION

**{¶ 54}** Having overruled plaintiff's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and BROWN, JJ., concur.

_________________